UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ILLIANA REALTY, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No. 20-cv-1165-JES-JEH |
| | ) |
| MATTHEW F. WHEBBE and | ) |
| PINK DOGWOOD I, LLC, | ) |
| | ) |
| Defendants and | ) |
| Counterclaim Plaintiffs, | ) |
| | ) |
| v. | ) |
| ILLIANA REALTY, LLC, JERRY L. GIBBS, | ) |
| and WILLIAM J. CRABTREE, | ) |
| | ) |
| Counterclaim Defendants. | ) |

## ORDER AND OPINION

This matter is now before the Court on a Motion for Partial Summary Judgment brought by Plaintiff Illiana Realty, LLC, ("Seller') and Counter Defendants Illiana, Jerry Gibbs as Trustee, and William Crabtree (Doc. 34). Defendants/Counter Plaintiffs, Matthew F. Whebbe, individually, and Pink Dogwood I, LLC, ("Purchasers") have filed their own Motion for Summary Judgment (Doc. 38). Each party has filed a Response and Reply. For the reasons indicated herein, the Motion for Partial Summary Judgment of Seller is GRANTED, as to the issue of liability, reserving the damages issue for trial. The Amended Counterclaim against Seller; and Counter Defendants Gibbs, and Crabtree is DISMISSED. The Motion for Summary Judgment of Purchasers (Doc. 38) is DENIED and their Affirmative Defenses # 1, 2, and 4 are DISMISSED. This case shall proceed to trial on the damages asserted by Seller and Purchasers'

Third Affirmative Defense denying that Seller entitled to damages and, that any alleged damages were the result of Seller's failure to mitigate.

## BACKGROUND

This dispute arises from a contract titled, "Real Property Purchase and Sale Agreement II," ("REPA II), concerning the sale of real property in McHenry, Illinois. The Plaintiff, Illiana Realty, LLC, ("Seller"), is wholly owned by Jerry L. Gibbs, as Trustee of the Jerry L. Gibbs Trust of 8/28/08 and as Successor Trustee of the Carla J. Gibbs Trust of 8/28/08. (Doc. 37–4). In the original complaint, Plaintiff named various Defendants, with Allied Big R Stores, LLC, Central Big R Stores, Inc., Watseka Rural King Supply, Inc., Citibank, N.A., Tea Olive 1, LLC, and Teal Olive, LLC, being dismissed on the parties' joint motion on August 20, 2020.

Seller subsequently filed an Amended Complaint, naming Pink Dogwood I, LLC, ("Dogwood"), a Minnesota limited liability company jointly owned by Matthew Whebbe and a family trust, and Matthew F. Whebbe, individually, who personally guaranteed 'the performance and payment obligations of Purchaser" under the REPA. (Doc. 35-4 at 15). On August 27, 2020, Defendants Dogwood and Whebbe filed a Second Amended Answer and Amended Counterclaim, denying the allegations of the Amended Complaint, asserting four Affirmative Defenses, and requesting a Declaratory Judgment clarifying their rights and obligations under REPA II.

Seller asserts that Purchasers violated the terms of REPA II when they failed to close on the sale of the McHenry Property. Seller requests a finding that Purchasers are in breach of REPA II, and dismissal of the Amended Counterclaim and Affirmative Defenses against it. Seller requests partial summary judgment, a ruling on the liability issues only, reserving the damages issue for trial.

Purchasers' Motion for Summary Judgment asserts that Seller and Counter Defendants are the breaching parties, requesting a dismissal of the Complaint, Summary Judgment in their favor on the Affirmative Defenses, and a Declaratory Judgment as to whether they have any remaining rights or obligations under REPA II.

The nexus of the dispute is whether Seller had timely performed a Lot Split of the McHenry Property, obligating Purchasers to perform under the REPA II and close on the Property. The parties' cross motions for summary judgment largely rely on the same operative facts which the Court recounts below, identifying those facts which are disputed.

**MATERIAL FACTS**

On August 16, 2018, Seller and Purchasers entered into the written REPA II Agreement under which Seller was to subdivide three properties prior to sale; the "Morris Property", the "Elkhart Property", and the subject McHenry Property. The Morris and Elkhart Properties closed without incident with the only controversy being the sale of the McHenry Property.

The McHenry Property was part of a larger parcel which, under the terms, was to be parcelized and separated from the Remainder Property. Seller's obligation in this regard was known as the "Lot Split." The Agreement provided that the Lot Split was to be done "in accordance with all applicable laws, including the preparation of any subdivision plat or replat of each of the Properties and applicable Remainder Property, or other subdivision documents and seeking government approval thereof…" *See* REPA II at § 1.06 below in relevant part:

> **Section 1.06. Lot Splits**. Seller and Purchaser hereby acknowledge and agree that (a) each of the Properties is currently part of a larger parcel of land that is owned by the applicable Seller(s) (the portion of such larger parcel owned by a Seller that is not to be conveyed to Purchaser is referred to as a "<u>Remainder Property</u>"); (b) prior to Closing, Seller at their sole cost and expense, shall cause each of the Properties to be parcelized and separated from the applicable Remainder Property in accordance with all applicable laws, including the preparation of any

> subdivision plat or replat of each of the Properties and applicable Remainder Property, or other subdivision documents and seeking government approval thereof (collectively referred to herein as the "Lot Split"); (c) on or before Closing, Sellers shall deliver (or cause to be delivered) to Purchaser a new legal description of each of the Properties (excluding the applicable Remainder Property)… In the event that any Lot Split is not completed on or before July 31, 2019, then unless otherwise agreed by the parties hereto, This Agreement shall terminate with respect to such Property, in which event neither Purchaser nor Sellers shall have any further duties or obligations under this Agreement with respect to such Property, except the obligations that expressly survive termination.

*Id*. (Doc. 35-4 at 2).

Under REPA II, the sale was to close "within ten (10) business days of the later of two conditions: Sellers' delivery of (a) notice to Purchaser that a Lot Split for such Property has been completed, and (b) sufficient evidence of completion of the Lot Split to the Title Company." *See* REPA II at § 3.01.

Seller asserts that the McHenry Property had been parcelized and separated, with the relevant government authorities' having approved the final subdivision plat before July 31, 2019. Seller provides evidence that on May 7, 2019, the City of McHenry issued an Ordinance No. 19-1963, granting approval of the final plat. (Doc. 36-3). The McHenry Planning and Zoning Commission approved the plat on March 20, 2019. On April 19 and May 20, 2019, Seller's Counsel forwarded email documents to Purchasers in anticipation of the closing. Thereafter, there was some delay waiting for the Illinois Department of Transportation ("IDOT") to approve the plat. IDOT did so on July 26, 2019, issuing an "Illinois Department of Transportation Certificate." Seller asserts that as of that date, all approvals required for the subdivision of the McHenry Property had been obtained, other than "ministerial signatures," apparently referring to the signatures of the City Clerk, Treasurer, and Engineer; and the County Clerk.

On July 30, 2019, Counsel for Seller sent an email to Purchasers stating:

> As you know, we needed Illinois Dept of Transportation approval for the subdivision plat (because Rt 31 is their road) and they sat on it for 3+ months, but have now finally signed. Our engineers in McHenry are transmitting the plat to the city to sign (the city has already approved it) and then to the county for signature and recording. With this step finally moving toward completion, we can set up our closing. I had sent a number of closing docs to Dan/Catherine previously, let me know if you have any comments on those docs. We also need to get the title company in the loop.

(Doc 36-5 at 1). Seller asserts that this provided notice to Purchasers that the Lot Split was complete. Counsel ended by stating "I will let you know when the plat is recorded."

Seller asserts that, pursuant to the already-approved City Ordinance, the City Clerk, City Treasurer, and City Engineer affixed their signatures to the plat on August 5, August 6, and August 8, 2019, respectively. McHenry County would not record the plat, however, without full payment of the second installment of real estate taxes not otherwise due until September 3, 2019. Counsel for Seller relayed this information to purchaser and Whebbe in an e-mail dated August 15, 2019. While Seller initially asserted that that Purchaser Dogwood was leasing the McHenry property with responsibility for the tax liability under the Split Lot Lease Agreement, Seller later conceded that former Defendant Tea Olive I, LLC was the lessee, and that Dogwood had no responsibility for the real estate taxes. Tea Olive I, LLC paid the taxes, and on August 28, 2019, Counsel for Purchaser confirmed that the payment had been sent to McHenry County. The County Clerk and Recorder signed the Plat on September 4, 2019 and it was recorded that day.

Seller asserts that it timely performed the Lot Split and that Purchasers breached when they did not close on the property. Purchasers claim that the Lot Split was not finalized until September 4, 2019, and that pursuant to § 1.06, the Agreement automatically terminated on August 1, 2019, relieving Purchasers of any further obligation.

Seller denies that the Lot Split was untimely, but asserts, even if it were, Purchasers violated § 6.02 of the REPA, *Remedies in the Event of Default* as it did not give notice of its intent to terminate the Agreement. Section 6.02 provides that in the Event of Default, the non-defaulting party has the election of providing notice to the defaulting party and seeking indemnification; or waiving the Event of Default and proceeding to Closing. These two alternatives are identified in REPA II as the non-defaulting party's "sole and exclusive remedy." *Id*. at § 6.02. Seller asserts that Purchaser continued to move toward closing, without asserting default, and thereby waived the issue.

In support, Seller cites Purchasers' course of conduct after July 31, 2019. On August 28, 2019 Purchasers had sent an email to Seller, indicating that the tax payment (owed by Tea Olive I, LLC) had been sent. In addition, on September 17, 2019, Purchasers' Counsel, through a paralegal, sent an email to Seller stating, "Now that the subdivision is complete, I will reach out to the title company to get them on board and obtain an updated title search. We'll complete our review of the closing docs you sent and provide you with our comments, if any." (Doc. 37–3 at 1).

Plaintiff, through Gibbs, attests that it first learned Purchasers did not intend to close on the property in October 2019, when they asserted that the Lot Split has not been timely done. *See* Gibbs's Affidavit (Doc. 37-4). Gibbs attests that, prior to that, Defendant Webbe "had asked for additional time to close on the McHenry Property, and has tried to tie the closing of the McHenry Property into resolution of other open disputed items between seller and purchaser and their affiliates." *Id*. *See also*, the September 16, 2019 email from Purchasers' Attorney, "I understand Matt and Jerry have talked about getting McHenry done in connection with a global resolution of

all open items…" (Doc. 37–3 at 2). Seller agreed, allegedly at Purchasers' request, to postpone the closing to January 2020, at the latest. (Doc. 37-5).

Seller asserts that Purchasers failed to perform under REPA II, and that Defendant Webbe has engaged in such conduct before, citing *FKS Enterprises, Inc. et al. vs. Whebbe, et al.*, No. 27-CV-19-13794 (4th Dist. Minn. October 1, 2021), a case currently under appeal. Seller asks that the Court take judicial notice of the Order where the Minnesota Court determined Whebbe had personally committed fraud on FKS, finding "… by April 26, 2019, Whebbe's modus operandi was to stall the FKS Transaction closing with the hope of getting out of it and getting a different and better deal." (Doc. 37-7). Seller asserts the underdeveloped argument that the Minnesota action is relevant as to "Purchaser's and Webbe's actual reasons for failing to close on the McHenry Transaction." (Doc. 35 at 12).

Purchaser challenges the reference to the Minnesota case, asserting that a statement summarizing another case is not a fact for purposes of CDIL-LR 7.1(D)(1)(b). Purchaser asserts, further, that even if it were construed otherwise, it is not relevant as it was Seller who failed to perform under REPA II.

### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant if entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of

material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once a properly supported motion for summary judgment is filed, the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). The party opposing summary judgment "must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

Accordingly, the non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

**SELLERS' MOTION FOR SUMMARY JUDGMENT (DOC. 34)**

Seller asserts that Purchasers were contractually obligated to close on the McHenry property and denies that the Lot Split was not timely done. Seller asserts the July 31, 2019 date was neither a deadline for the completion of the subdivision of the property, nor a deadline for conveying the property. Seller cites § 1.06 to support that it was only obligated to pursue actions to subdivide the property so that it would be "parcelized and separated" by that date; and consistent with this, REPA II did not require that the property close immediately upon being parcelized and separated, but "within ten (10) business days of the later of: Sellers' delivery of

(a) notice to Purchaser that a Lot Split for such Property has been completed and (b) sufficient evidence of completion of the Lot Split to the Title Company…" REPA § 3.01.

Seller references the July 30, 2019 email from Seller's Counsel to Purchasers as notice that the Lot Split had been completed and all approvals [other than ministerial signatures] had been obtained. (Doc. 36-5). Purchasers respond that under the terms of §6.01, the property was to be parcelized and separated "in accordance with applicable laws," which required the preparation of a new plat and seeking governmental approvals for the plat. Purchasers claim that Sellers did not obtain all governmental approvals by that date as state, city and local laws required that the Plat be recorded, something that was not done until September 4, 2019. Purchaser asserts that as a result of this, the REPA II Agreement automatically terminated under § 1.06, with neither party having further duties or obligations.

Purchasers make the additional argument that Seller's claim that it had only to parcelize and separate the Property by July 31, 2019, is contrary to §7.09, the "Time is of the Essence" clause. This states in its entirety "[t]he parties hereto expressly agree that time is of the essence with respect to this Agreement." *Id*.

**PURCHASERS' MOTION FOR SUMMARY JUDGMENT (DOC. 38)**

Purchasers identify the REPA II Lot Split requirement as a condition precedent to any obligations they might have under the Agreement. Purchasers assert that the Lot Split did not occur on or before July 31, 2019, extinguishing their duty to close on the property. Purchasers cite the deposition testimony of Seller's counsel, Attorney Michael Seghetti, as testimony that for the Lot Split to be effective, the signatures of the City and County Clerk were necessary. Seller responds that this misrepresents Mr. Seghetti's testimony and, even if it were otherwise, Counsel's opinion is not controlling. The Court has reviewed the deposition testimony and finds

Mr. Seghetti testified that the City and County signatures were required for the recording of the plat, and for closing, but not for the Lot Split. *See below*:

> Q. Because again you're noting that approval from the city council isn't all that needs to happen, you have to go forward and get the plat actually recorded, correct? 1
> A. In order to close, yes.
> Q. And in order to split the lot, correct?
> A. Again, I wouldn't say that necessarily.

(Doc. 38-3 at 18).

> Q. So you would agree with me that the city's approval is subject to the plat being recorded, fair?
> A. No, I don't think that means that the approval is subject to that, just that they're going to require that it actually be recorded. A lot of -- municipalities or the counties or whoever approves plats always want to make sure that the plat actually gets recorded.

(Doc. 38-3 at 19).

The issue is not whether governmental approval was needed to record the plat, but the level needed to effect a Lot Split. When Mr. Seghetti was asked whether the signatures of the County Clerk, City Officers, IDOC and the Recorder, were needed for the Lot Split approval, he answered that while the City and IDOT approval was necessary, the other signatories were part of the City. The evidence shows that the City of McHenry had already approved the plat, having done so by Ordinance on May 6, 2019. In addition, while the plat needed to be recorded prior to the sale, nothing in REPA II § 1.06 requires that it be recorded prior to the effective date of the Lot Split.

Purchasers also request summary judgment in their favor as to the Affirmative Defenses asserted in their Second Amended Answer to the Amended Complaint. Purchasers had initially pled four Affirmative defenses but request that Affirmative Defense #2, alleging Seller's, "unclean hands" be dismissed, which the Court will do.

Affirmative Defense #1 alleges that Seller's claim is barred as it was Seller who breached the REPA II Agreement. In Affirmative Defense #3, Purchasers deny that Seller has incurred any damages and assert, further, that any claimed damages were due to Seller's failure to mitigate. In Affirmative Defense #4, Purchasers allege that Seller's Complaint is barred by the Statute of Frauds. Purchasers claim that, as REPA II automatically terminated on August 1, 2019, there was no longer an enforceable contract between the parties and any sale after that date would run afoul of the Statute of Frauds.

## DISCUSSION

To prevail on a breach of contract claim under Illinois law, a plaintiff must prove "the existence of a valid and enforceable contract, the breach of the contract by the defendant, the performance by the plaintiff and the resultant injury to the plaintiff." *Allstate Ins. Co. v. Winnebago County Fair Ass'n, Inc.*, 475 N.E. 2d 230, 236 (2d Dist. 1985) (citing *Thilman & Co. v. Esposito*, 408 N.E. 2d 1014 (1980)). Here, there is no dispute but that the parties entered into a valid enforceable contract, so the Court need only consider whether Seller or Purchasers breached, and whether there was injury to Seller.

The parties have ascribed different meanings to the § 1.06 definition of the Lot Split. Under Illinois law, the court "must initially determine, as a question of law, whether the language of a purported contract is ambiguous as to the parties' intent. If no ambiguity exists in the writing, the parties' intent must be derived ... as a matter of law, solely from the writing itself." *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 889 (N.D. Ill. 2001). "A contract term is ambiguous if it can reasonably be interpreted in more than one way due to the indefiniteness of the language or due to the terms having more than one meaning. However, '[a] contract is not rendered ambiguous merely because the parties disagree on its meaning.'"

*Specialty Earth Scis., LLC v. Carus Corp.*, 15-06133, 2021 WL 4804076, at *11 (N.D. Ill. Oct. 14, 2021) (internal citations omitted).

The Court has examined §1.06 which is divided into subsections (a) – (f), to determine whether, as a matter of law, there is ambiguity as to the requirements for the Lot Split. Subsection (a) concerns the Remainder Property and does not address the Lot Split. Subsection (b) defines the Lot Split, providing that prior to closing, Sellers will in accordance with all applicable laws, cause the property to parcelized and separated from the Remainder. This action is to include the preparation of any subdivision plat or replat, or other subdivision documents, "and seeking government approval thereof." These conditions are "collectively referred to" as the Lot Split, defining its terms.

Subsection (c) does not address the Lot Split, and only provides that Seller is to deliver a legal description if each of the properties prior to closing. Subsection (d) does not address the Lot Split, and provides that prior to closing, Seller will cause utilities and systems on the properties to be separately metered, with separate tax ID numbers. Subsection (e) provides that following the Lot Split and prior to closing, Seller shall be responsible for providing rights of access, ingress, and egress. Subsection (f) provides that, prior to closing, Seller shall be responsible to ensure various easements. It also provides that in the event the Lot Split is not completed by July 31, 2019, REPA II will terminate, absent other agreements of the parties.

As Seller aptly points out, §1.06(b) only required Seller to "cause" the "parceliz[ing] and separat[ing]" of the McHenry Property, through the preparation of a subdivision plat, and "seeking government approval thereof." (Doc. 35 at 15). "Seeking" is a present tense verb indicating an ongoing action rather than one already accomplished, and cannot reasonably be read otherwise. Where the contract language is unambiguous, it should be given its plain and

ordinary meaning. *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 308, 882 N.E.2d 525, 528-29 (2008).

The Court finds, as did the Appellate Court in *Platinum Supplemental Ins., Inc. v. Guarantee Tr. Life Ins. Co.*, 989 F.3d 556, 564 (7th Cir. 2021), that the dispute here is "not one of interpretation or ambiguity, however, but rather one of the appropriate application of this otherwise clear language." The language at § 1.06 does not require the recording of the plat as a condition to the Lot Split, nor does it require that all action necessary to the recording be performed at the time of the Lot Split. These actions were to be done prior to closing, which was to occur within 10 business days of notice of the Lot Split under the two conditions previously identified. *See* §3.01. REPA II could have been written to require all final government approval and the recording of the plat by July 31, 2019, but it did not, and the Court will not read this language into it.

Purchasers also fail in the claim that the parcelizing and separation was not done "in accordance with all applicable laws." Purchasers do not allege that there were irregularities in the separation of the property and preparation of the plat; that it was done unlawfully. Rather, they claim that state, city, and local laws required that the plat be recorded, and this was not done until September 4, 2019. As previously noted, § 1.06 does not require that all local governmental bodies sign-off, or the plat be recorded for purposes of the Lot Split.

The facts establish that the subject property had been separated, the plat and other subdivision documents had been prepared and Sellers were "seeking government approval," the collective elements required to effect the Lot Split. As a result, the Court finds as a matter of law that the language of § 1.06 is not ambiguous, and Seller had finalized the Lot Split prior to the

July 31, 2019 deadline. As the Lot Split, a condition precedent to Purchasers' obligation to close, was performed, and as Purchasers failed to close, the Court finds them in breach of REPA II.

As Seller was not in breach of REPA II, the Court need not consider Seller's additional arguments that Purchasers' conduct after July 31, 2019 operated as a waiver; or that Purchasers failed to declare an Event of Default as required under § 6.01.

## PURCHASERS' AFFIRMATIVE DEFENSES

Purchasers have asserted Affirmative Defenses # 1 and 4, that Seller was the breaching party and that REPA #II terminated on August 1, 2019 so there was no longer a written, enforceable contract for the sale of real property as required by the Statute of Frauds. Affirmative Defenses #1 and 4 are DISMISSED, as the Court has found that Seller did not violate the Lot Split provision and did not breach, so that REPA II continued in full force and effect. As previously noted, Purchasers have requested the dismissal of Affirmative Defense #2, and it is hereby dismissed.

The remaining Affirmative Defense, #3— goes to whether Seller has incurred damages and failed to mitigate those damages. Seller has reserved the damages issue for trial and this remains a justiciable issue. Accordingly, a ruling as to Affirmative Defense #3 is RESERVED, to be determined at the trial on damages. Affirmative Defenses #1, 2 and 4 are DISMISSED.

## CONCLUSION

For the reasons stated above, the Motion for Partial Summary Judgment of Plaintiff and Counter Defendants (Doc. 34) is GRANTED as to the liability issues, with the issue of damages RESERVED. The Motion for Summary Judgment of Defendants/Counter Plaintiffs (Doc. 38) is DENIED. Defendants/Counter Plaintiffs' Amended Counterclaim against Plaintiff and Counter Defendants is DISMISSED, as are the First, Second and Fourth Affirmative Defenses. The Third

Affirmative Defense which goes to the issues of damages is RESERVED, to be determined at trial.

ENTERED this  13th  day of  April  , 2022.

                                                         s/James E. Shadid  
                                                          JAMES E. SHADID  
                                                  UNITED STATES DISTRICT JUDGE